Argued and submitted September 26, 1980, remanded February 3, 1981

WILLAMINA EDUCATION ASSOCIATION,
*Petitioner,*

*v.*

WILLAMINA SCHOOL DISTRICT 30J, et al,
*Respondents.*

(ERB Case No. C-93-78, CA 16905)

623 P2d 658

Henry H. Drummonds, Eugene, argued the cause for petitioner. With him on the brief was Kulongoski, Heid, Durham & Drummonds, Eugene.

Bruce Bischof, Sunriver, argued the cause for respondent Willamina School District 30J. With him on the brief was Bischof & Jaqua, Sunriver.

Al J. Laue, Assistant Attorney General, Salem, waived appearance for respondent Employment Relations Board.

Before Joseph, Presiding Judge, and Warden and Warren, Judges.

JOSEPH, P.J.

## JOSEPH, P.J.

Petitioner Willamina Education Association (Association) seeks judicial review of an Employment Relations Board (ERB) order dismissing its unfair labor practice complaint against respondent Willamina School District 30J (District). The ERB ruled that the District did not violate ORS 243.672(1)(g)[1] by refusing to comply with an arbitration award rendered in the Association's favor.

During the 1976-1977 school year the District hired two teachers from its substitute list to replace two other teachers who were unable to continue teaching throughout the school year. The teachers were paid by the District at the rate for daily substitutes. They were not given written employment contracts. Both teachers claimed that their salaries should be based on their education and experience under the salary schedule in the collective bargaining agreement, which provided rates of pay for teachers "covered by [the] agreement." The recognition clause of the agreement defined the bargaining unit:

"The bargaining unit, in accordance with ORS 243.711, shall consist of all regular full time and regular part (1/2 time or more) certificated teachers."[2]

"Teachers" was also defined by the agreement:

"Unless otherwise indicated, the term 'teachers,' when used hereinafter in this agreement, shall refer to all professional employes represented by the bargaining [sic] in the negotiating unit as above defined ***"

A five-step grievance procedure culminating in the submission of grievances to an arbitrator was provided for. "Dispute[s] or disagreement[s] involving the interpretation or application of specific provisions of [the] Agreement ***"

---

[1] ORS 243.672(1)(g) provides:

"It is an unfair labor practice for a public employer or its designated representative to do any of the following:

"(g) Violate the provisions of any written contract with respect to employment relations including an agreement to arbitrate or to accept the terms of an arbitration award, where previously the parties have agreed to accept such awards as final and binding upon them."

[2] In 1973, the former ORS 243.711 was renumbered ORS 243.650. Or Laws 1973, ch 536, § 1.

were to be resolved by final and binding arbitration. The agreement also provided:

> "[T]he Arbitrator shall not add to, subtract from, modify or amend any terms of this Agreement, nor shall he impose any obligations on the Association or the District not expressly agreed to by the terms of this Agreement. The decision of the Arbitrator shall be submitted to the Board and the Association and shall be final and binding on the parties within the scope of the Arbitrator's authority."

When the parties were unable to agree whether the two teachers were "regular" teachers within the bargaining unit covered by the agreement or substitutes not covered by the agreement, the Association took the issue to arbitration. The arbitrator found that the two teachers in question were "regular" teachers, because the teachers performed the normal functions of regular full-time teachers during the period they worked.[3] He concluded, also, that it did not matter that the teachers were hired from the substitute list and were not given written contracts.

The arbitrator noted that ORS 342.845[4] defines "substitute" and "temporary" teacher as follows:

> "(7) 'Substitute teacher' means any teacher who is employed to take the place of a probationary or permanent teacher who is temporarily absent.
>
> "* * * * *
>
> "(9) 'Temporary teacher' means a teacher employed to fill a position designated as temporary or experimental or to fill a vacancy which occurs after the opening of school because of unanticipated enrollment or because of the death, disability, retirement, resignation, or dismissal of a permanent teacher."

While he found that the two teachers fitted into the statutory category of "temporary teacher," he concluded that that category and "regular," the classification in the recognition clause quoted above, were not mutually exclusive; so the teachers could also be regular full-time teachers within the terms of the agreement.

---

[3] The arbitrator relied primarily on *Lommasson v. School District No. 1,* 201 Or 71 (1954).

[4] The correct citation is ORS 342.815.

The District took the position that whether the two teachers were "temporary" or "substitutes," they were neither regular full-time nor regular part-time teachers and they were, therefore, not members of the bargaining unit and were excluded from its coverage. The District also claimed that the dispute was not even arbitrable because the two teachers were not entitled to any of the contractual benefits of the bargaining agreement, including the grievance-arbitration procedure. The District also pointed to Article 6 of the agreement, entitled "Substitutes," which it claimed treats substitutes as a separate class of non-bargaining employees. Article 6 provides:

> "The Board and the Association recognize that, in the event substitute teachers are employed, effort will be made to ensure that the effectiveness of the educational program is not impaired. It is agreed, therefore, that the superintendent shall conduct in conjuction [sic] with the IED, annually, an active search to establish a list of the most qualified substitutes available and shall continue to supplement the list whenever possible during the course of the academic year."

When the District refused to honor the arbitrator's award, the Association filed an unfair labor practice complaint. ERB ruled that the District did not commit an unfair labor practice within the meaning of ORS 243.672(1)(g) when it refused to comply with the arbitrator's award because "this Board finds the award palpably wrong, and therefore, repugnant to the Public Employe Relations Act (PERA)." The Association appeals from the ERB order, claiming that ERB employed an improper scope of review in reviewing the award.

ERB employed a three-pronged test, which it labeled the *Spielberg-Siegel*[5] test. That scope of review was described by ERB in *Eugene Education Association v. Eugene School District,* Case No. C-141-78, 4 PECBR 2598 (1980):[6]

> "An unfair labor practice complaint charging failure to comply with an arbitration award requires this Board to

---

[5] *Spielberg Manufacturing Co.,* 112 NLRB 1080 (1955); *Siegel v. Gresham Grade Teachers Assn,* 32 Or App 541, 574 P2d 692 (1978).

[6] *Eugene Ed. Assoc. v. Eugene Sch. Dist. 4J,* 50 Or App 191, 623 P2d 657 (1981).

review the award to determine whether to honor it before ordering compliance therewith. The standard of review applied by this Board is that enunciated by the National Labor Relations Board in *Spielberg Manufacturing Co.* and its progeny, adopted by this Board in *Siegel v. Gresham Grade School District No. 4,* and subsequently affirmed by the Court of Appeals. The *Spielberg* test, as adopted by this Board, provides that an arbitration award will be honored if: (1) the arbitration proceedings were fair and regular; (2) the parties had agreed to be bound thereby; and (3) the decision of the arbitrator was not palpably wrong and, therefore, not repugnant to the PERA. Under this test, this Board reviews the merits of an arbitration award to the extent of determining whether the award is palpably wrong." (Footnotes omitted.)

The Association does not contest the first two parts of the test. It claims, however, that ERB expanded the third one to include too wide-ranging a review of the award on its merits.

In *Siegel, supra* n 5, we approved the *Spielberg* scope of review adopted by ERB:

"The test for determining whether an arbitration decision should be followed, as formulated by the National Labor Relations Board and adopted by ERB, has three parts. An arbitration decision will be honored if (1) the arbitration proceedings were fair and regular; (2) the parties had agreed to be bound thereby; and (3) the arbitrator's decision was not repugnant to the act. *See, International Harvester, Inc.,* 138 NLRB 923 (1962), *enf'd sub nom Ramsey v. NLRB,* 327 F2d 784 (7th Cir), *cert den* 377 US 1003 (1964); *Spielberg Manufacturing Co.,* 112 NLRB 1080 (1955)." 32 Or App at 546.

The third part of the test was framed in terms of the award's compatability with the basic policies of the collective bargaining statute. We agreed with ERB's reasoning in *Siegel* that the arbitration award in that case was not repugnant to PERA:

"*** In determining whether to honor a prior arbitration award, this Board does not approve or disapprove of the reasoning used by the arbitrator in support of his award. We merely determine whether the award is 'palpably wrong' when analyzed under the [PERA]." 32 Or App at 548.

In this case, ERB purported to review the award under the *Spielberg-Siegel* test; however, it did not review the award solely for its repugnancy to PERA. ERB stated: "[U]nder this test, this Board reviews the merits of an arbitration award to the extent of determining whether the award is palpably wrong."

In *Willamina Education Association 30J and Barbara Crowell Lucanio v. Willamina School District 30J* 30-44-63J, Case no. C-253-79, 5 PECBR 4086 (1980), ERB recognized that the scope of review it had employed in this case had in fact modified the *Spielberg-Siegel* test:

"In *Eugene Education Association v. Eugene School District,* Case No. C-141-78, 4 PECBR 2598 (1980), a majority of the members of this Board announced that this Board would review arbitrators' awards in enforcement proceedings under the same standards it uses in deferral cases.[2] The standards set out were that the award would be enforced if: (1) the arbitration proceedings were fair and regular; (2) the parties had agreed to be bound thereby; and (3) the decision of the arbitrator was not palpably wrong and, therefore, not repugnant to the PECBA.

"Further reflection, research and experience applying the above test have led this Board to conclude that the standards enunciated in *Eugene* should be modified, particularly the third element of the standards.

"The standards adopted in *Eugene* are substantially different from the review standards applied by the U.S. Supreme Court in the *Steelworkers Trilogy* and by the Oregon appellate courts in cases discussed below. *In addition, the third element of the standard is so vague and broad that it militates against the PECBA policy of encouraging mutually-agreed upon grievance and arbitration procedures to resolve labor disputes. (See ORS 243.650(21), 243.656(5), 243.706(1) and, of course, 243.672(1)(g) and (2)(d).)*

---

"2. The tests applied in deciding whether or not this Board should defer to a prior arbitration award in unfair labor practice cases are found in *Siegal [sic] v. Gresham Grade Teachers Association,* Case No. C-112-76, 3 PECBR 1390 (1977), 32 Or. App. 541 (1978). The *Siegal* [sic] tests will be

applied in ULP cases charging other than a (1)(g) or (2)(d) violation."[7] (Emphasis supplied; other footnotes omitted.)

We conclude that by reviewing the merits of the arbitration award, ERB employed a scope of review contrary to the policy of PERA, which favors binding arbitration as a means of dispute resolution. *See* ORS 243.706, ORS 243.712(2)(c); ORS 243.722(4) and ORS 243.762. Therefore, we remand this case to ERB for a proper interpretation and application of the law. ORS 183.482 (8) (a) (B).

Remanded.

---

[7] ERB went on to announce the scope of review it would apply in future cases involving the enforcement of arbitration awards under ORS 243.672(1)(g):

"This Board believes that the policies of the PECBA will be better effectuated if it restricts its review of arbitration awards in (1)(g) and (2)(d) complaints to the stricter standards generally followed by federal and Oregon courts. (To this extent, this Board views its role under (1)(g) and (2)(d) be analagous to that of the federal courts under Section 301 of the Labor Management Relations Act.)

"* * * * *

"It will further the PECBA policy of encouraging the resolution of disputes through mutually-agreed upon procedures if this Board also adopts strict standards for review of arbitration awards. Even under strict limitations on review, however, an arbitrator is not totally unfettered in rendering an award that will be enforced. In *Enterprise Wheel,* the Supreme Court added that an arbitrator's award 'is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.' (46 LRRM at 2424)

"Similarly, ORS 243.672(1)(g) and (2)(d) make it an unfair labor practice to refuse to accept the terms of an arbitrator's award only 'where previously the parties have agreed to accept such awards as final and binding upon them.'

"* * * * *

"For the above reasons, this Board holds that in this case and future cases it will enforce an arbitration award unless it is clearly shown that either:

"(1) The parties did not, in a written contract, agree to accept such an award as final and binding upon them (for example, an arbitrator finds no violation of the agreement, but upholds a grievance as constituting an unfair labor practice; an arbitrator exceeds a limitation on his authority expressly provided in the collective bargaining agreement); or,

"(2) Enforcement of the award would be contrary to public policy (for example, the award requires the commission of an unlawful act; the arbitration proceedings were not fair and regular and, thus, did not conform to normal due process requirements)."